OPINION OF THE COURT
Phyllis Gangel-Jacob, J.
In this CPLR article 78 proceeding petitioner, the brother of a homicide victim, seeks certain relief against officials of the New York State Department of Correctional Services (DOCS) with respect to the temporary release privileges granted to his brother’s convicted killer. This proceeding was originally commenced in September 1993. Respondents moved in the first instance to dismiss the proceeding. By decision and order dated June 15, 1994, I denied that motion and set the matter down for a hearing. By stipulation of the parties the hearing was stayed and respondents have now answered the petition.
The facts of this case have already been laid out in my previous decision dated June 15, 1994. In short, it is petition *399 er’s contention that John Bonizio (Bonizio), despite the brutal nature of the crime of which he was convicted and his alleged ties to organized crime, is being treated with extraordinary leniency by the respondents which amounts to a grant of virtual freedom from incarceration under the guise of participation in various temporary work release, furlough and other rehabilitation programs. In his amended petition, petitioner seeks an order (1) declaring that respondents’ grant of permission to Bonizio to participate in these programs is an abuse of discretion and revoking Bonizio’s participation in any such program, or alternatively (2) limiting Bonizio’s participation in any such program so that his absences from any correctional facility conforms to periods which do not exceed the mandates of the Correction Law, (3) declaring the Day Reporting Center Program to be in conflict with the Correction Law and (4) directing respondents to notify petitioner and his family before any temporary release of Bonizio.
Respondents raise two preliminary issues in their answer: (1) improper venue and (2) petitioner’s alleged lack of standing to bring this proceeding.
I find respondents’ objection to venue to be without merit. CPLR 506 (b) directs that an article 78 proceeding shall be venued in the county wherein the decision objected to was made, or wherein the proceedings involved took place or where the respondent’s principal office is located. As petitioner points out, Bonizio is serving a sentence imposed in New York County and petitioner is attempting to ensure that this sentence is duly carried out. Moreover, this petition had been filed for more than a year before respondents answered it. In that time there has been active motion and appellate practice, the scheduling of a hearing, stipulations and one amendment of the petition. I agree with petitioner that respondents are barred by loches with respect to this issue and do not condone such dilatory tactics. Venue herein is proper.
Petitioner does not seek to overturn any statute or law but rather enforcement of the laws governing the release from confinement of duly convicted criminals. He seeks this relief with respect to the confinement of an individual who not only has been convicted of manslaughter in the killing of petitioner’s brother but who allegedly poses a threat to petitioner himself. It is alleged in the petition that Bonizio has threatened the life not only of petitioner but of a witness to the killing and an undercover police officer associated with the prosecution of the case.
*400 The principal case in New York State on the issue of standing in an article 78 proceeding is Matter of Sun-Brite Car Wash v Board of Zoning & Appeals (69 NY2d 406 [1987]). On balance, it favors petitioner’s position. "Because the welfare of the entire community is involved * * * there is much to be said for permitting judicial review at the request of any citizen, resident or taxpayer” (Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, supra, at 413). While that case involved zoning decisions, its language applies all the more pointedly to the administration of the criminal justice system. As pointed out in Matter of Vergari v Ward (88 Misc 2d 911 [Sup Ct, Albany County 1977], affd 60 AD2d 949 [3d Dept 1977]) the Department of Correctional Services is not alone in its responsibility to administer the serving of criminal sentences; the District Attorney also has a responsibility to see that the sentences imposed as a result of his efforts are duly carried out. The provision of notice to and a hearing of the victims of a crime at the time of its perpetrator’s parole hearing would seem to confer a similar standing on such victims (see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, supra, at 413-414) as do the respondents’ own rules and regulations which govern the administration of the temporary release program (7 NYCRR part 1900 et seq.) which require that any profit to an inmate from the inmate’s participation in temporary release must be weighed against whatever risk would be posed to the community by such release (see, 7 NYCRR 1900.4 [1] [2]; 1900.5). Indeed, under Correction Law § 857, any person is entitled to point out to the Commissioner abuses concerning temporary release programs. Accordingly, I find that petitioner’s standing in this case is proper.
Turning to the merits of the petition, the request by petitioner for a declaration that the Day Reporting Program is in conflict with the Correction Law is denied. Respondents concede that Bonizio, as a person convicted of homicide, is ineligible for participation in the Day Reporting Program under any circumstances (7 NYCRR part 1925) and aver that Bonizio has never participated in such a program, nor do the records submitted herein indicate any participation by Bonizio in a Day Reporting Program. The conduct of the Day Reporting Program is therefore irrelevant to petitioner’s claim here. As to petitioner’s demand to be notified of any of Bonizio’s absences from prison, this court has already previously directed respondents to so notify petitioner, which direction I reassert herein (see, Correction Law § 149-a).
*401 The questions remain what temporary release program Bonizio is actually participating in, and whether his participation conforms to the Correction Law and the regulations promulgated thereunder. These questions were to have been explored at the hearing previously scheduled by me and agreed to be stayed by the parties upon my consideration of the papers herein. The first papers submitted by respondents on their motion to dismiss did not explain or document what schedule Bonizio was on. Respondents have been more forthcoming in their verified answer to the petition now before me. They have submitted copies of Bonizio’s furlough and work release requests as well as copies of documents reflecting the actions taken thereon. These documents indicate that between April 1984, when Bonizio entered the prison system, and January 1992 Bonizio was incarcerated in prisons all designated "general confinement facilities”. During the period between December 1988 and January 1992 he was granted numerous furloughs, none of which appear to have exceeded seven days at a time, or 25 days total in any one year (see, Correction Law § 851 [4]; 7 NYCRR 1900.3 [c]). In January 1992, he was approved for participation in the temporary work release program. He was simultaneously approved for transfer to Queensboro Correctional Facility, designated as a work release facility, a general confinement facility and a residential treatment facility. The only documentation concerning what Bonizio’s temporary release program there consists of is found as exhibits D and E to the affidavit of respondent James Recore, Director of the Bureau of Temporary Release of the New York State Department of Correctional Services, sworn to September 27, 1994 (Recore affidavit). It is less than revealing. Exhibit D is an unsigned copy of Bonizio’s work release contract which shows on the first page an "initial work date” of May 25, 1992 and "actual work hours” of from 9:30 a.m. to 7:30 p.m. It includes a purported work schedule (apparently effective Mar. 16, 1994) as follows:
[[Image here]]
*402 The second page shows a "furlough effective date” of March 16, 1994 from Wednesday at 7:30 a.m. to Monday at 9:30 p.m. There is no documentation offered which shows what Bonizio’s temporary release schedule was previous to March 16, 1994. The only indication is found in exhibit E (Continuous Temporary Release Program TRC Review Form) dated September 28, 1993 which recommends Bonizio’s retention in the program upon his being "held 24 months” for parole (see, Correction Law § 851 [2]), and which recites "[ijnmate is working and has been continuously employed for several years.” However, the Recore affidavit (para 20) states that Bonizio’s schedule consists of full-time employment outside the facility and a five-day furlough to "an approved residence” (his own), and paragraph 25 of the verified answer admits that Bonizio has spent more than 28 days residing outside Queensboro since 1993. Respondents contend that since Bonizio is not a general confinement inmate, the 28-day limitation of 7 NYCRR 1900.3 (c) does not apply.
Respondents’ statements conflict with the petitioner’s own statements, in both the petition and in the reply to respondent’s answer, that he had been told by two unnamed employees of the Department of Correctional Services in August 1993 that Bonizio was "out” on the Day Reporting Program. He also states that in September 1993 Commissioner Coombe (respondent Coughlin’s successor) volunteered the information that although Bonizio had been on Day Reporting, since his September 1993 denial of parole he had been placed on a "5 and 2” arrangement. Commissioner Coombe allegedly defined this expression, erroneously, to mean that Bonizio spent five nights in prison and two at home, whereas respondents now state that the converse is true. The statements reported by petitioner have been disclaimed by respondents.
The limitations of the temporary release program are laid out in Correction Law §§ 73, 112, 852 and 7 NYCRR part 1900 et seq. As summarized in this court’s previous decision, the temporary release program includes a work release program, a furlough program, a community services program, an industrial training leave, an educational leave or a leave of absence (Correction Law § 851 [9]; 7 NYCRR part 1900). A work release program is a continuous temporary release program which allows inmates the privilege of leaving the premises of an institution for a period not exceeding 14 hours in any day for the purpose of on-the-job training or employment (Correction Law § 851 [3]; 7 NYCRR 1903.1 [a]). A furlough program *403 is a short-term temporary release program which allows an inmate the privilege of leaving the premises of an institution for a period not exceeding seven days only for the purpose of seeking employment to prepare for the inmate’s return to the community, to maintain family ties and/or solve family problems, to seek postrelease housing to prepare for the inmate’s return to the community, or to attend a short-term educational or vocational training course (Correction Law § 851 [4]; 7 NYCRR 1901.1 [c] [2]). The furlough program, as it applies to a "general confinement inmate”, is limited to a total of 28 days per year (7 NYCRR 1900.3 [c] [2] [i] [a]).
Under 7 NYCRR 1903.1 "[c]entrai office approval for any long-term temporary release program also implies approval for all other temporary release programs at the discretion of the temporary release committee and the facility superintendent.” Under 7 NYCRR 1901.1 (d) (7) an inmate being transferred to a work release program facility after central office approval shall be eligible for furlough from the transferring facility. However, there is nothing in the rules and regulations that establishes furloughs as a component or subcategory of temporary work release. Indeed, under the rules governing continuing temporary release programs it is specifically provided that "[u]nder no circumstances shall an inmate be given any extension of time on work, educational or other continuous temporary release programs which would cause him to be in the community more than 14 hours in any given day” (7 NYCRR 1903.2 [e] [6] [iv]), and while part 1903 provides for the granting of furloughs to participants in the work release program, nowhere do the rules governing continuous temporary release programs (7 NYCRR part 1903) provide for furloughs that coincide with work release days.
Respondents assert that because of budget constraints and the tremendous overcrowding of State correctional facilities, it has become necessary "with the full knowledge and continued approval of the Legislature, to double-encumber work release beds. This is a process by which two inmates can be assigned to the same bed within a work release facility by having one inmate furlough to an approved residence during one part of the week while the other inmate sleeps at the institution, and then having the second inmate furlough to an approved residence during a different part of the week while the first inmate sleeps at the institution” (affidavit of Anthony J. Annucci, Deputy Commr and Counsel for NY State Dept of *404 Correctional Servs, sworn to Sept. 27, 1994 [Annucci affidavit]). The Annucci affidavit further states:
"16. The practice of double-encumbering work release beds began in 1990 and was necessitated because the Senate and the Assembly could not agree on how to house offenders that would be sentenced to State prison in the Fiscal Year beginning on April 1. To close the housing gap, the Legislature and the Executive agreed that DOCS [Department of Correctional Services] would administratively implement this double-encumbering initiative for work release * * *
"19. Since the Legislature actively negotiates the proposed budget for DOCS and must finally approve it, the Legislature was and is fully aware of the practice of double-encumbering work release by DOCS. Moreover, by enacting the Budget, the Legislature affirmatively chose to approve this practice in lieu of other possible alternatives that would address demand for capacity such as prison expansion or sentencing reform. In addition, since the Temporary Release Program has a sunset clause, in order for DOCS to continue to operate such Program it is necessary for the Legislature to periodically enact extenders. Most recently, in enacting Chapter 61 of the Laws of 1994, the Legislature extended the Temporary Release Program until September 1, 1995.
"20. Lastly, if the Legislature had wished to change this practice in any way, it would have enacted appropriate legislation”.[1]
In this regard, respondents submit as exhibit F to the verified answer a copy of a DOCS "Operational Policy & Procedure” directive dated September 30, 1992 enunciating "Double Encumbrance Rules” which requires every work release facility to use double encumbrance as part of their overall facility operating plan. "Double encumbrance” is defined as "using a single (1) bed to provide sleeping accommodations to two (2) inmates by alternating the nights each inmate is required to stay in the facility.” Inmates are identified by status. " 'A’ status and 'B’ status inmates shall be defined as inmates who share a single on alternate nights and who are required to stay in the facility two nights per week”. Accord *405 ing to Bonizio’s schedule, he is only required to stay in the facility two nights per week, and he is therefore, according to this directive, designated an "A” or "B” status inmate. The DOCS policy directive further recites the rule that:
"Inmates who are defined as either 'A’ or 'B’ status inmates shall be made up of the following type of inmates * * *
"1. employed
"2. ODOP
"3. within 8 weeks of their * * * Conditional Release
"4. within 8 weeks of their * * * Maximum Expiration”.
According to the records submitted by respondents with their answer, Bonizio’s conditional release date is November 13, 1995 and his maximum expiration date is November 13, 2001. Yet he is being accorded the privileges of an "A” or "B” status inmate in violation of the DOCS policy directive.
Respondents initially confused the issue by stating that Bonizio was in a work release program, a branch of the temporary release program. In actual fact, Bonizio appears to be on a continuous furlough, punctuated weekly by two nights in prison. He does not fit the profile of an "A” or "B” status inmate entitled to participate in the "double encumbrance” program. As I have pointed out here and in my previous decision, neither under the statute nor under the rules and regulations thereunder does work release otherwise involve nightly absences from the facility. The significance of work release lies in the fact that inmates of facilities approved for work release are not limited to 28 furlough days per year, as are general confinement inmates who, it appears, are not generally granted work release status. Since Bonizio’s consecutive furloughs are separated by two nights (not days) in prison, it might be said technically that they do not exceed seven days in length. However, the rules do not admit of even five days of furlough while an inmate is on work release.
It appears from the record of Bonizio’s furlough and work release requests that the initial resistance on the part of the administrators of DOCS to release, however briefly, a man convicted of such a violent crime was overcome by Bonizio’s record in prison. He has reportedly completed a college degree, participated in many prison activities and organizations and maintained a perfect disciplinary record. It appears however that the administrators have come under a striking misapprehension as to the real nature of Bonizio’s crime. By way of example, notwithstanding the gravity of the crimes for *406 which Bonizio was convicted,[2] as set forth in DOCS Central Office memoranda to the temporary release chairperson that Bonizio had "brutally beat his victim to death” and "caused the death of a young man by beating him with a baseball bat * * * another concern is Bonizio’s conviction of trying to bribe a New York Police Detective (Advanced warning of police raids on numbers operations)” (Recore affidavit, exhibit B, Notices of disapproval for temporary release, dated Apr. 18, 1989 and Nov. 7, 1990, respectively), the temporary release committee’s recommendations for approval of Bonizio’s participations in the temporary release programs essentially change this focus in reliance on Bonizio’s positive prison record to the extreme minimization of his criminal record. In this regard, the submitted papers show such sympathetic and perhaps factually inaccurate recitations as, "[t]he manslaughter conviction involves the inmate and an accomplice doing a friend a favor by 'roughing up’ a young man who had threatened the friend’s daughter. (Charges had been filed against the deceased, but no action was taken.) The assault deteriorated to a beating death when the accomplice 'flipped out’ ” and "[positive institutional record. Very serious instant offense — death of male victim, Bonizio involved with the Genonese family * * * the Woodburne staff feels that inmate Bonizio had probably accomplished more than any other inmate at Woodburne C.F.” (Recore affidavit, exhibit B, recommendations, dated Sept. 7, 1990 and Dec. 7, 1990, respectively; see also, temporary release recommendations, dated May 21, 1991, Sept. 5, 1991.)
Since his incarceration Bonizio has come up for parole three times. Each time the victim’s family and certain others have appeared and strenuously registered their opposition with the Parole Board. Each time Bonizio was denied parole. Yet, as the record shows, he has been granted virtual freedom from incarceration since at least 1993. This extreme anomaly in the system’s treatment of Bonizio, a violent felon, contributes to *407 the pain of the victim’s family and defuses the effectiveness of our criminal justice system.
In this regard it is particularly significant that on January 24, 1995 Governor George E. Pataki issued Executive Order No. 5 (Executive Order) eliminating temporary release for dangerous felons and in the public interest directing DOCS to "promulgate, modify, adopt or rescind any rules or regulations, or emergency rules or regulations * * * to prevent the future transfer to any temporary release program or residential treatment facility any inmate sentenced as a violent felony offender convicted of a crime involving the infliction of serious physical injury, the use or threatened use of a dangerous instrument or the use or threatened use of a deadly weapon” (Executive Order, McKinney’s Session Law News of NY, at A-230).
Moreover, contrary to respondents’ budget and space concerns as set forth in defense of Bonizio’s purported double encumbrance status in this proceeding, the Governor made specific reference to the fact that according to DOCS "there is adequate capacity in the correctional system to accommodate restricting the release to temporary release programs of all violent felony offenders” (Executive Order, op. cit).
While the Governor’s Executive Order cannot affect inmates now authentically in or already approved for temporary release or residential treatment facility programs, it is an important guidepost in this proceeding to the dangers of abuse inherent in such programs in disregard of the public interest. Here it is clear that, whether by reference to the plain language of respondents’ rules and regulations or by reference to the plain language of the DOCS double encumbrance policy directive, Bonizio is not entitled to the extent of the liberty that has been accorded to him; respondents’ inexplicable leniency in terms of Bonizio’s virtual freedom from incarceration under the guise of temporary work release places them in violation of the statute and their own rules and regulations.
Due to the nature of this proceeding, the relief to be afforded by this court can be prospective only. Accordingly, the petition is granted to the extent that respondents are directed forthwith to limit Bonizio’s participation in the work release and furlough programs to the extent such participation is permitted only precisely in accordance with the statutes and regulations governing such temporary release programs, to wit, in respect of Bonizio’s double encumbrance and *408 lengthy furlough privileges, I rule these privileges were void ab initia. In this regard, respondents are directed to immediately cease Bonizio’s participation in such programs and to treat any future participation by Bonizio in such programs as subject to the proscriptions of the Executive Order. In respect of Bonizio’s actual full-time employment as attested to by respondents, under no circumstances shall Bonizio be given any extension of time on his work release program such as to cause him to be in the community more than 14 hours in any given day (7 NYCRR 1903.2 [e] [6] [iv]) nor more than five days a week; under no circumstances shall Bonizio be granted a furlough which does not strictly accord with the purposes therefor and restrictions thereon as set forth in Correction Law § 851 (4), 7 NYCRR 1901.1 (c) (2); 1900.3 (c) (2) (i) (a); part 1903, and the Executive Order; under no circumstances shall any furlough be granted to Bonizio that coincides with his work release days such that he does not return to the correctional facility the evening of each day he goes out on work release.
Respondents are directed, within 20 days from the date hereof, to provide petitioner and this court with documentation evidencing Bonizio’s actual employment on work release and respondents’ compliance with the statute and the rules and regulations thereunder as directed herein, failing which respondents shall be subject to sanctions for contempt which shall include fines, to be set by this court, for each day respondents fail to so comply (see, Judiciary Law §§ 753, 773; Jackson v New York State Dept. of Correctional Servs., 173 AD2d 467).

. Pursuant to Laws of 1994 (ch 60, § 42) the Legislature has enacted legislation which limits inmate eligibility for participation in the work release program. Under this legislation Bonizio would be ineligible because of the nature and classification of the crime of which he was convicted. However, respondents assert that this legislation is prospective only.

. Bonizio was convicted in 1984 of the crimes of manslaughter, first degree, bribery, second degree, and possession of gambling records, first degree, as to which he is serving concurrent sentences of 6 to 18 years, 1 to 3 years and 1 year. His earliest temporary release records as presented to this court by respondents recite that Bonizio "and one other beat and killed a male with a baseball bat. The victim had been harassing the inmate’s boss’ daughter. The father asked the inmate to get the male to cease harassment * * * Inmate offered and paid policeman in excess of $34,000 to leave his gambling operations alone” (Recore affidavit, exhibit B, Temporary Release Case Summary, dated Dec. 12, 1988).